IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DEANNA E. HARRIS-STEINHOFF,    )
                               )
                               )
            Plaintiff,         )
                               )
      v.                       )    Case No. 07-3143-CV-S-REL-SSA
                               )
MICHAEL J. ASTRUE, Commissioner)
of Social Security,            )
                               )
            Defendant.         )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Deanna E. Harris-Steinhoff seeks review of the
final decision of the Commissioner of Social Security denying
plaintiff's application for disability insurance benefits and
supplemental security income benefits based on disability.
Plaintiff argues that the Administrative Law Judge ("ALJ") made
an improper determination of her credibility, made an incorrect
determination of her residual functional capacity, and did not
consider the combined effects of her impairments in arriving at
her residual functional capacity. I find that there was no error
at the administrative level, and therefore plaintiff's motion for
summary judgment will be denied and the decision of the
Commissioner will be affirmed.

*I.  BACKGROUND*

This suit involves two applications made under the Social
Security Act ("the Act"). The first is an application for
disability insurance benefits under Title II of the Act, 42

U.S.C. §§ 401 et seq. (Tr. 78-80). The second is an application for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 579-82).

Section 405(g) of the Act provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1383(c)(3) of the Act provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title XVI.

Plaintiff protectively filed her applications for benefits under Titles II and XVI on October 7, 2003 (Tr. 78-80, 578-82). She stated that she was born in 1964 and alleged that she became disabled beginning April 30, 2002 (Tr. 78). She alleged disability due to chronic obstructive pulmonary disease ("COPD"), degenerative arthritis, emphysema, asthma, and depression (Tr. 121).

Plaintiff's applications were denied (Tr. 44, 58-63, 583-89). On March 3, 2006, following a hearing, an administrative law judge rendered a decision in which he found plaintiff was not under a "disability" within the meaning of the Act (Tr. 13-22). On March 21, 2007, the Appeals Council denied plaintiff's request for review (Tr. 7-9). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard

3

presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1.    Is the claimant performing substantial gainful activity?
            Yes = not disabled.
            No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

            Yes = disabled.
            No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

            No = not disabled.
            Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

            Yes = disabled.
            No = not disabled.

### IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

### A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

1.  Applications for Supplemental Security Income

On May 24, 2002, plaintiff completed her application for supplemental security income (Tr. 572-75).  In her application,

5

plaintiff reported that her date of birth is June 26, 1964, her disability began on April 30, 2002, and that she is not now married (Tr. 572). She lives in a home, which she rents at $332.00 per month, with her child (Tr. 573). Her only asset is a 1990 Chevy valued at about $1,000.00 (Tr. 573). Plaintiff reported that she is self-employed earning about $6,000.00 annually for babysitting (Tr. 574). Her only other subsistence comes in the form of food stamps (Tr. 574).

On October 30, 2003, plaintiff completed another application for supplemental security income (Tr. 579-82). In that application, plaintiff reported that she lives in a trailer, which she rents for $300.00 per month, and that her father pays about $180.00 of the rent per month (Tr. 581). Her only asset is a vehicle valued at about $400.00, and her only income comes from AFDC ($234.00) and food stamps (Tr. 581).

2. Earnings Statement

Plaintiff's earnings statement includes the following income for the years indicated:

| | |
|------|---------|
| 1981 | 693.64 |
| 1982 | .00 |
| 1983 | 12.73 |
| 1984 | .00 |
| 1985 | 2934.93 |
| 1986 | 5869.08 |

6

| | |
|---|---|
| 1987 | 2712.21 |
| 1988 | 3516.39 |
| 1989 | 1598.84 |
| 1990 | 2460.15 |
| 1991 | 4593.06 |
| 1992 | 0.00 |
| 1993 | 4752.65 |
| 1994 | 4769.80 |
| 1995 | 5074.86 |
| 1996 | 3532.50 |
| 1997 | 6230.31 |
| 1998 | 7720.02 |
| 1999 | 3762.31 |
| 2000 | 5672.03 |
| 2001 | 2291.89 |
| 2002 | 1530.36 |
| 2003 | 1707.00 (Tr. 92). |

3. Disability Reports

In an undated Disability Report, plaintiff reported that she could not bend or lift, and that the heat, cold and cleaning supplies used in her work affected her ability to breath. She also stated that these conditions first bothered her on January 10, 1991, and she became unable to work on April 12, 2002 (Tr. 94).

In an October 17, 2003, Disability Report, plaintiff reported her illnesses as including: chronic obstructive pulmonary disease, degenerative arthritis, emphysema, asthma, and depression. She also reported that she cannot lift over five pounds, needs to periodically reposition, her breathing difficulties limit her work opportunities (e.g., extreme heat or cold, chemicals, dust, allergens, etc.), and she must lie down periodically during the day. Plaintiff reported that these illnesses first troubled her in June of 1970, and that they ultimately caused her to leave employment on April 30, 2002 (Tr. 121). She also reported that while employed the heaviest weight lifted was less than ten pounds both occasionally and frequently (Tr. 122). Plaintiff reported her medications as follows:

Albuterol Neb. for breathing problems, which causes hyperactivity;

Combivent for breathing problems, which causes hyperactivity;

Celebrex for arthritis, which causes hyperactivity;

Trazodone for depression, which causes hyperactivity; and

Talwin-NX for arthritis, which upsets the stomach (Tr. 126).

4.    Agency Questionnaire

On March 5, 2004, plaintiff responded to questions posed by the agency and stated that her medical conditions include COPD, asthma, and degenerative arthritis. She represented that her symptoms, which prevent her from working, include breathing

problems and back pain (Tr. 146). To address these symptoms, she reported using a nebulizer two to three times per week (Tr. 147).

As to financial activities, plaintiff reported that she pays bills, uses a checkbook, completes money orders, and counts change (Tr. 147). Her household activities include laundry, dishes, making the bed, and vacuuming (Tr. 148). She reported that she shops once or twice a week for about 20 minutes, and she usually prepares either sandwiches or microwaved meals (Tr. 148).

As to sleep, plaintiff reported that she has been restless and experiences the "sweats" at night. She also advised that she has generally abandoned efforts dealing with her personal appearance (e.g., makeup and hair) (Tr. 148). Her daily activities include getting up, drinking coffee, attempting to do some household tasks, and watching television (Tr. 149). Other activities include reading magazines and newspapers, and playing video games (Tr. 149).

Plaintiff drives to the store and doctor about once or twice a week, but is unable to drive unfamiliar routes (Tr. 149). She leaves her home about two or three times per week and for about two hours (Tr. 149).

Plaintiff reported that she has no difficulty with instructions, verbal or written, she does not require reminders to complete tasks, and she has no difficulties interacting with others (Tr. 150).

Case 6:07-cv-03143-REL   Document 11   Filed 07/17/08   Page 9 of 36

5.  Work Activity Report

On May 3, 2005, plaintiff completed a Work Activity Report in which she claimed that she ended her employments, dating back to 1991, due to her medical condition (Tr. 151-71). She reported that she has worked less hours with fewer duties in the past few years (Tr. 172).

When asked whether she would like to receive vocational rehabilitation, plaintiff checked "no" (Tr. 173).

### B.  SUMMARY OF MEDICAL RECORDS

On April 28, 2000, plaintiff went to the emergency room complaining of shortness of breath and wheezing (Tr. 213-14). She reported a history of asthma, ulcers, and emphysema (Tr. 213). She described herself as single, divorced, and reported smoking a pack of cigarettes a day (Tr. 213). Plaintiff was treated and released with directions to see her treating physician (Tr. 214).

On May 8, 2000, plaintiff underwent a radiological examination (Tr. 217). According to the report, there were no infiltrations or effusions, the heart was normal, and the pulmonary vascularity[1] was not remarkable (Tr. 217).

On May 30, 2000, plaintiff went to the emergency room complaining of shortness of breath and wheezing (Tr. 220-221).

_____

[1]Pulmonary vascularity refers to the pulmonary vein, which is one of four vessels that carry aerated blood from the lungs to the left atrium of the heart.

10

Her previous medical history was reported as asthma (Tr. 220).
Plaintiff reported that she was using tobacco on a regular basis
(Tr. 220).  She was diagnosed as suffering from acute asthma
exacerbation, treated and released (Tr. 221).

On October 5, 2000, plaintiff underwent a radiological
examination of her chest, which showed no abnormality to her
heart and mediastinum,[2] and no evidence of pulmonary edema[3] (Tr.
225).

On March 7, 2001, plaintiff underwent a radiological
examination of her pelvis, which revealed only slight
levoscoliosis, which is a curve in the spine that points to the
left (Tr. 233).

On December 22, 2001, plaintiff went to the emergency room
complaining about GI bleeding (Tr. 241).  She reported that she
had just returned from a cruise to Jamaica, became ill with
diarrhea and vomiting, and was treated on board with an
antibiotic (Tr. 241).  Her lungs showed moderate wheezing in all
lung fields, but no rales,[4] wheezing or rhonchi[5] (Tr. 242).  The

---

[2]The area between the lungs in which the heart, the trachea,
the esophagus, the bronchi, and lymph nodes are found.

[3]Pulmonary edema occurs when fluid in the air sacs of the
lungs prevents them from absorbing oxygen.

[4]Rale is a type of abnormal lung sound heard through a
stethoscope.

[5]Rhonchi is an added sound occurring during inspiration or
expiration and caused by air passing through bronchi.

Case 6:07-cv-03143-REL   Document 11   Filed 07/17/08   Page 11 of 36

diagnosis was gastrointestinal illness and a history of coffee-ground emesis[6] (Tr. 242).  Plaintiff was treated, instructed to stop smoking and follow up with her treating doctor (Tr. 242).

On December 22, 2001, plaintiff underwent a radiological examination of her abdomen, which showed only mild thoracolumbar scoliosis[7] (Tr. 250).

On December 26, 2001, plaintiff went to the emergency room complaining of GI bleeding (Tr. 251-52).  She reported a history of asthma and disclosed that she was a smoker (Tr. 251). Examination of her lungs showed moderate wheezing in all lung fields but no rales, wheezing or rhonchi (Tr. 252). She was diagnosed with gastrointestinal illness and a history of coffee-ground emesis, and released with instructions including to stop smoking (Tr. 252).

On July 2, 2002, plaintiff went to Dennis Robinson, D.O., with complaints of back pain (Tr. 276). Examination showed she had pain and tenderness in the thoracic and lumbar areas with range of motion, but was in no acute distress; and there were no neurological deficits (Tr. 276).

In a July 5, 2002, letter, chiropractor Patrick Theobald, D.C., wrote that plaintiff had been treated eight times between

---

[6]Coffee ground emesis is vomiting associated with upper GI bleeding.

[7]Thoracolumbar scoliosis is a curve between the thoracic and lumbar areas of the spine.

Case 6:07-cv-03143-REL   Document 11   Filed 07/17/08   Page 12 of 36

April 22, 2002, and May 15, 2002, and that her symptoms were reduced by 75 to 80 percent (Tr. 261). Dr. Theobald opined plaintiff would be better suited to a job that did not require bending and lifting (Tr. 260-61).

On July 19, 2002, plaintiff underwent an MRI, which showed degenerative disc changes at L5-S1 (Tr. 319).

On July 26, 2002, Dennis Robinson, D.O., wrote that a magnetic resonance imaging ("MRI") scan of the lumbar spine had shown "some degenerative changes" but there was nothing meriting surgery (Tr. 275).

On August 2, 2002, plaintiff went to the emergency room with complaints of low back and knee pain (Tr. 262). Examination showed decreased range of motion and muscle spasm, but her extremities were non-tender with a full range of motion, and there were no motor or sensory deficits (Tr. 264). Her breath sounds were normal, and her mood and affect were normal (Tr. 264). Plaintiff was given a muscle relaxer and pain medication (Tr. 265).

On September 5, 2002, plaintiff went to the hospital complaining of an injured foot which occurred while she was getting out of a boat (Tr. 266). The doctor found no fractures (Tr. 267; 313).

On September 19, 2002, plaintiff complained of sinus symptoms (Tr. 311). She reportedly used a Combivent inhaler to

13

manage her COPD, and reported that she had stopped using marijuana six months prior and felt "much better" (Tr. 311).

On October 18, 2002, respiratory was unremarkable with the exception of some general expiratory wheezes (Tr. 308).

On February 7, 2003, pulmonary function testing showed "moderately severe, moderately reversible obstructive pulmonary disease" with "mildly" reduced diffusing capacity (Tr. 271).

On February 27, 2003, plaintiff reported that she was out of her asthma medications and examination showed bilateral wheezing (Tr. 272). However, her back was not tender to palpation (Tr. 272).

On March 5, 2003, plaintiff went to the emergency room with complaints of chest pain, but reported that she continued to smoke about one package of cigarettes per day (Tr. 286). Examination showed the lungs were clear and there were no friction rubs or wheezing (Tr. 287). Chest x-rays showed no pneumothorax (collapsed lung) (Tr. 291). She was assessed with bronchitis and pleuritic chest pain (Tr. 287).

On May 22, 2003, plaintiff went to see her doctor complaining about symptoms unrelated to her impairments (Tr. 359-60). The doctor reported that plaintiff continued to "smoke against medical advice a pack of cigarettes a day" (Tr. 360).

On June 13, 2003, plaintiff went to her doctor for a follow-up visit on her "gyn-fatigue" (Tr. 352). She complained that she

14

may be going through menopause for the last year with symptoms of hot flashes, insomnia and anxiety worsening (Tr. 352). Her physical examination showed plaintiff to be in no apparent distress, and the doctor changed her medication in an effort to eliminate the anxiety and hot flashes (Tr. 353).

On June 16, 2003, plaintiff was admitted to the hospital with pneumonia, but quickly responded to medication and was discharged home (Tr. 320). She was still smoking one package of cigarettes per day (Tr. 322). It was noted that her COPD was managed with a Combivent inhaler daily, an albuterol inhaler as needed, and an albuterol nebulizer approximately two times per month (Tr. 323). Examination showed her oxygen saturation on room air was 97 percent (Tr. 323). Plaintiff was advised to stop smoking (Tr. 324). In the history section of her present illness, plaintiff reported that "[s]he had had no recent travel, although she did go to the lake over the weekend and was jet-skiing" (Tr. 322).

On December 4, 2003, pulmonary function testing showed "mild" obstructive impairment (Tr. 338). Her forced vital capacity ("FVC") was "normal" and her forced expiratory volume at one second/forced vital capacity ("FEV/FVC") ratio was only "slightly" reduced (Tr. 338).

On January 7, 2004, plaintiff went to the Family Medical Walk In Clinic with complaints of a cough (Tr. 339). Respiratory

15

examination was "within normal limits" (Tr. 340).

On May 7, 2004, plaintiff went to Charles J. Ash, M.D., for a consultative examination (Tr. 380-82). She continued to smoke one package of cigarettes per day (Tr. 380). Dr. Ash noted plaintiff moved about without a limp or list, was able to walk on her heels and toes, squatted "normally," and had no difficulty arising from the examination table and chair or with dressing and undressing (Tr. 380). Her lungs were clear (Tr. 380). Examination of the thoracic and lumbar spine showed tenderness in the lumbar region, but range of motion was "normal" and there was no spasm or deformity (Tr. 381). She also had "normal" range of motion in her upper extremities with no weakness or atrophy (Tr. 381). Grip and pinch strength were "strong" in both hands, and there was no sensory deficit (Tr. 381). Examination of the lower extremities showed positive straight leg raise testing at 70 degrees, but "normal" motion of the hips, knees, and ankles (Tr. 381). There was no weakness, deformity, or atrophy (Tr. 381). Dr. Ash's impression was early degenerative arthritis of the lumbar spine (Tr. 381). He opined that she had no "measurable limitation based on objective findings" (Tr. 381).

On May 13, 2004, G. W. Sutton, Ph.D., a state agency psychologist, reviewed the evidence of record and opined plaintiff did not have a severe mental impairment (Tr. 383), and that her ability to function was not limited in any way by a

16

mental impairment (Tr. 393).

On May 28, 2004, plaintiff went to Timothy Kinzie, D.O., to establish care (Tr. 426). She was still smoking (Tr. 426). Examination showed she was in no respiratory distress and breath sounds were "normal" (Tr. 426). She was oriented, and her mood and affect were "normal" (Tr. 427). Plaintiff was advised of the importance of smoking cessation (Tr. 427).

On June 30, 2004, plaintiff's examination showed no respiratory distress (Tr. 424). She was again advised to stop smoking (Tr. 425).

On July 2, 2004, plaintiff went to the emergency room with complaints of chest pain, but had no shortness of breath (Tr. 523). Examination showed she was in no acute distress and no respiratory distress (Tr. 524). She was assessed with viral pleuritis[8] (Tr. 524).

In July and August 2004 examinations by Dr. Kinzie, plaintiff was in no respiratory distress, and the doctor continued to advise her to stop smoking (Tr. 416-18, 421-22).

On August 6, 2004, plaintiff underwent a radiological examination of her stomach, which showed that her lungs, spleen, adrenal glands, and pancreas were "unremarkable[,]" and examination of her kidneys and bowel showed nothing abnormal or

---

[8]Viral pleuritis is a viral infection of the pleurae (i.e., the thin covering that protects and cushions the lungs).

inflamed (Tr. 433).

On November 9, 2004, plaintiff went to the emergency room after having been involved in a "fender bender" (Tr. 512). She stated she was hit from behind at about five miles per hour in a parking lot (Tr. 512). Examination of her neck revealed only muscle spasms, and examination of her back was unremarkable (Tr. 511-12).

On November 11, 2004, plaintiff was examined by Dr. Kinzie. Plaintiff was oriented with a normal mood and affect (Tr. 414). Her gait was steady and motor examination was normal (Tr. 414). There was no vertebral tenderness, and she had a "normal" range of motion in all four extremities (Tr. 415). X-rays of the cervical spine were "normal" (Tr. 415, 431). Dr. Kinzie also noted plaintiff's oxygen saturation on room air was 99 percent (Tr. 414).

On November 16, 2004, plaintiff returned to Dr. Kinzie and reported improvement with decreased pain (Tr. 412). Examination showed full muscle strength, negative straight leg raise testing, and range of motion in her neck was "much improved" (Tr. 412-13). Dr. Kinzie also noted plaintiff needed Lexapro[9] refills, but that she was doing well and her mood and affect were "normal" (Tr. 412-13). Dr. Kinzie again advised plaintiff to stop smoking (Tr. 413).

---

[9]Lexapro is a drug used to treat depression and anxiety.

18

On February 15, 2005, Dr. Kinzie treated plaintiff for an asthma exacerbation (Tr. 407-08). He again advised her to stop smoking (Tr. 408). On February 22, 2005, her breathing was improved even though she had not picked up her Flovent[10] (Tr. 404). Plaintiff stated she was using her albuterol[11] three times a day (Tr. 404). Plaintiff was advised to pick up her medication and to stop smoking (Tr. 405).

On March 1, 2005, plaintiff had picked up her medication and reported that she was feeling better (Tr. 402). Examination revealed no respiratory distress and normal breath sounds (Tr. 402). Dr. Kinzie wrote that plaintiff's asthma was "much improved" on Flovent (Tr. 402). He again advised her to stop smoking (Tr. 403).

On July 1, 2005, plaintiff went to Dr. Kinzie with complaints of back pain (Tr. 398). Examination showed "mild" tenderness, but no motor or sensory deficits, and straight leg raise testing was negative bilaterally (Tr. 399). Examination of her lungs also showed no respiratory distress and normal breath sounds (Tr. 398).

On August 23, 2005, plaintiff complained of back pain over the past few days (Tr. 469-70). Examination showed positive straight leg raise testing on the right at 60 degrees, but

---

[10]Flovent is an inhalant used to treat asthma.

[11]Albuterol is used to treat asthma.

19

straight leg raise testing on the left was negative, and she had no motor or sensory deficits (Tr. 470). David Showers, D.O., assessed lumbar myofascial strain[12] (Tr. 470).

On August 28, 2005, plaintiff was brought to the emergency room by ambulance with complaints of shortness of breath, fever, and chills (Tr. 436). She was still smoking (Tr. 441). Examination revealed she had a productive cough, but her breathing was "normal" (Tr. 436). A chest x-ray was negative, and a computed tomography ("CT") scan of the chest showed no evidence of any acute cardiac or pulmonary process (Tr. 450). Plaintiff was found to have bronchitis[13] (Tr. 442) and was instructed to stop smoking (Tr. 451).

### C. SUMMARY OF TESTIMONY

1.  Plaintiff's Testimony

Plaintiff appeared and testified at an administrative hearing held on November 15, 2005 (Tr. 590-622). She testified that she lives in a house with her boy friend and his brother, and that her son also stays with her on weekends and over the summer (Tr. 595, 614). Her son stays with her sister during the school year (Tr. 595).

---

[12]Lumbar myofascial strain is a muscle strain in the lumbar section of the back.

[13]Bronchitis is an inflammation of the bronchi.

20

Plaintiff testified that she last worked in June 2003 as a clerk in a convenience store (Tr. 595). She worked the cash register and did paperwork (Tr. 595). She had no responsibility for stocking shelves (Tr. 596). She quit that job due to health reasons when she was hospitalized for pneumonia (Tr. 596). Before this job, she worked at Dairy Queen, which she also quit for health reasons dealing with her back (Tr. 596).

Plaintiff testified that her illnesses include degenerative arthritis, levoscoliosis, early stages of emphysema, COPD, asthma, and cervical cancer resulting in a hysterectomy (Tr. 597). There has been no reoccurrence of cancer (Tr. 598).

Plaintiff testified that she can no longer work due to back pain, breathing problems, and depression (Tr. 598).

Plaintiff testified that she has had back pain since high school, although it has gotten worse (Tr. 598). She reported experiencing sharp back pain at least three to four times a day and dull pain almost all the time (Tr. 600). The sharp pain is brought on by activity, according to plaintiff (Tr. 600). She also reported muscle spasms accompanying the back pain (Tr. 601). These occur three to four times per day, according to plaintiff (Tr. 601-02).

Plaintiff testified that the pain is relieved by using her whirlpool tub and reclining (Tr. 602-03). She also said that she takes medications, including a non-steroidal anti-inflammatory

and a muscle relaxer, to reduce the pain and inflammation
(Naproxen and Flexeril) (Tr. 603-04). According to plaintiff,
these medications leave her with a dry mouth, a kind of
"grogginess," and the Flexeril contributes to her depression (Tr.
604).

Plaintiff testified that she has shortness of breath from
COPD (Tr. 604), which is treated with a daily inhaler as well as
a rescue inhaler as needed (Tr. 605, 607). She testified that she
is short of breath about 60% of the time (Tr. 604). If she walks
a half-flight of stairs, plaintiff claimed she would be "huffing
and puffing" (Tr. 605).

Plaintiff stated that she also has a nebulizer machine which
she uses two to three times a day, approximately four days per
week, and has for twelve years or more (Tr. 605-06). The
treatment will last about 30 to 40 minutes (Tr. 606).

Plaintiff also stated that she takes Albuterol and Combivent
(a rescue inhaler) for her breathing problems (Tr. 607).

Plaintiff stated that she still smokes about one-half of one
package of cigarettes per day (Tr. 613-14).

Plaintiff testified that she is depressed and often does not
want to do anything (Tr. 607). She testified that she is
depressed about 65% of the time (Tr. 607-08), which may be
manifested by crying episodes occurring five to six times per
week (Tr. 610). She said that she takes an antidepressant

22

medication (Lexapro) prescribed by her general practitioner, Dr. Kinsey, but has not been referred to a mental health professional (Tr. 608). She has taken Lexapro for three years (Tr. 609).

Plaintiff testified that can sit comfortably for about 20 minutes, the can walk about 15 to 20 minutes, and she can comfortably lift about five pounds (Tr. 611).

Plaintiff testified that her activities of daily living include doing laundry, cooking, and driving into town three to four times per week (Tr. 612-13). She occasionally sweeps the floors (Tr. 615). Her daughter and grandchildren come to visit her (Tr. 615).

2.  Vocational Expert's Testimony

A vocational expert also appeared and testified at the hearing (Tr. 616-21).

The ALJ posed a hypothetical question to the vocational expert which included an individual of plaintiff's age, education, and experience who could lift 20 pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday with normal breaks (Tr. 619). The hypothetical individual could occasionally stoop, crouch, crawl, kneel, balance, and climb, but would need to avoid concentrated exposure to temperature and humidity extremes as well as dust, fumes, and gases (Tr. 619).

23

The vocational expert testified that such an individual would be capable of performing all of plaintiff's past relevant employments, which were performed at the light and sedentary levels both as she performed them and as they are generally performed (Tr. 619). These positions include fast food assistant manager, fast food worker, bartender, motel clerk, escort driver, and cashier II (Tr. 617-18).

### D.   FINDINGS OF THE ALJ

On March 3, 2006, Stephen C. Calvarese, Administrative Law Judge, issued his decision denying plaintiff's applications for Social Security benefits (Tr. 16-22).

In that decision, the ALJ discounted plaintiff's allegations of disability based on depression.  He noted that there are no diagnoses of depression contained within the medical records and concluded that plaintiff's depression would not significantly affect her ability to work (Tr. 17-18).

The ALJ acknowledged plaintiff's other claims of disabling impairments (including emphysema, asthma, and chronic low-back pain) and concluded that these did not meet, either singly or in combination, a listed impairment under the Regulations (Tr. 18). Therefore, the ALJ proceeded to determine plaintiff's residual functional capacity to perform her past work or other work existing in significant numbers in the economy (Tr. 18).

24

On the question of plaintiff's back pain, the ALJ observed
that the plaintiff was treated by a chiropractor, D. Patrick J.
Theobald, who wrote on July 5, 2002, that although plaintiff had
severe discomfort and her lumbar range of motion was
significantly decreased, she responded to treatment and her
symptoms were reduced by 75 to 80 percent (Tr. 18). The ALJ also
observed that the treating chiropractor stated that plaintiff
could work if she were provided employment that did not require
bending or lifting (Tr. 18).

On the question of plaintiff's breathing difficulties, the
ALJ acknowledged that her chest pain has worsened with coughing
or deep breathing but that she continues to smoke cigarettes
daily (Tr. 18-19). The ALJ also pointed out that an August 28,
2005, CT of plaintiff's chest showed no evidence of pulmonary
embolism or acute cardiac or pulmonary process (Tr. 19).

The ALJ then proceeded to review the evidence in light of
the Polaski factors[14] (Tr. 19-20). He reviewed plaintiff's
testimony at the administrative hearing and acknowledged her
estimates of physical capacities (i.e., she could sit or stand
for 20 minutes, lift five pounds, cook for 15 to 20 minutes but
would then need to sit for five to ten minutes, and could drive
for about 20 miles) (Tr. 20). After reviewing the materials, the

_____

[14]Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

ALJ concluded that plaintiff's impairments are not as severe as alleged and specifically noted the following:

> Plaintiff's back problems were successfully addressed by her chiropractor, who opined that she would be suitable for work with accommodations for bending and lifting . . . .

> Plaintiff's breathing difficulties have not prevented her from doing a wide range of activities including cooking, laundry, sweeping, vacuuming, and shopping (Tr. 20).

Based on the record, the ALJ found that plaintiff could occasionally lift/carry 20 pounds and five pounds frequently; stand/walk or sit for six hours each in an eight-hour day; occasionally stoop, crouch, crawl, kneel, climb, and balance; but must avoid extremes in temperature and humidity and environments containing dust, fumes, and gases (Tr. 20).

The ALJ concluded that plaintiff was not disabled because she could return to her past relevant work as an assistant manager of a fast-food outlet, bartender, motel clerk, escort driver, and cashier, as those jobs were previously performed by her and are normally performed in the national economy (Tr. 21).

### V. *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there

are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 at 1322.

27

## 1. PRIOR WORK RECORD

Although the ALJ made no reference to plaintiff's work record, a review of the available materials shows that plaintiff's earnings over a period of twenty-two years were de minimus (Tr. 92). In a Work Activity Report, she claimed that she ended her employments, dating back to 1991, because of her medical conditions; yet her earnings before that time, when she was presumably healthy, are equally if not more inconsistent (Tr. 151-71). When asked whether she would be interested in vocational rehabilitation in May of 2005, plaintiff responded, "no" (Tr. 173). This factor does not support plaintiff's credibility.

## 2. DAILY ACTIVITIES

Although the ALJ failed in his decision to address plaintiff's representations as to her daily activities, my review of the record shows that her representations vary greatly from what she actually does.

Plaintiff stated in a March 5, 2004, agency questionnaire that her household activities include laundry, dishes, making the bed, and vacuuming (Tr. 148). She represented that she shops once or twice a week for about 20 minutes, and prepares meals consisting of sandwiches or microwaved dinners (Tr. 148). Plaintiff indicated that due to her illnesses, she has abandoned any effort to maintain her personal appearance and that her daily

28

activities include only the following: getting up, drinking coffee, attempting household tasks, watching television, reading magazines, and playing video games (Tr. 149).

On November 15, 2005, plaintiff testified and stated that her daily activities include laundry, cooking, occasionally sweeping, and driving to town three to four times per week (Tr. 615).

I find plaintiff's representations as to her daily activities are contradicted by the medical records. There is nothing in the record that supports the notion that plaintiff is essentially housebound and unable to do all but the most minimal of physical tasks.

In addition, I find it reasonable to infer that plaintiff is minimizing her daily activities based on a comparison of her earlier representation with statements attributed to plaintiff in her medical records. For example, in an undated Disability Report, plaintiff indicated that her medical conditions date back to January 10, 1991, and that eventually she became unable to work on April 12, 2002 (Tr. 94); and in an October 17, 2003, Disability Report plaintiff indicated that her medical conditions require her to lie down periodically during the day. However, the medical records show plaintiff returning from a cruise to Jamaica sometime around December 22, 2001 (Tr. 242), alighting from a boat on or about September 5, 2002, and jet skiing a short

29

time before June 16, 2003 (Tr. 322). This is hardly behavior characteristic of someone who is unable to do even the most sedentary of tasks.

This factor detracts from plaintiff's credibility.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

The ALJ recounted plaintiff complaints about her back pain but largely discounted them based upon the inference that she could be employed with accommodation for bending and lifting, as represented by her treating chiropractor (Tr. 18).

The ALJ also found that the medical record does not support the level of limitation plaintiff described (Tr. 20). The evidence supporting this finding includes:

> MRI testing that revealed only "some" degenerative changes in the lumbar spine (Tr. 275);
>
> Examinations that showed tenderness in plaintiff's back on a few occasions (Tr. 276, 381, 399), deceased range of motion on one occasion (Tr. 264), bilateral positive straight leg raise testing on one occasion (Tr. 381), and positive straight leg raise testing on the right on only one occasion (Tr. 470);
>
> On other occasions there was no tenderness in plaintiff's back(Tr. 272), she had a normal range of motion, and straight leg raise testing was negative (Tr. 381, 399, 413, 415, 470);
>
> Examinations consistently showed no motor or sensory deficits, and no muscle weakness or atrophy (Tr. 264, 381, 399, 413-14);
>
> Plaintiff had a normal gait and could heel-and-toe walk (Tr. 380, 414);

Case 6:07-cv-03143-REL   Document 11   Filed 07/17/08   Page 30 of 36

She could squat "normally," and had no difficulty arising from the examination table and chair, or with dressing and undressing (Tr. 380); and

Plaintiff's extremities were non-tender with a full range of motion (Tr. 264, 381, 415).

Although plaintiff was involved in an automobile accident sometime during November 2004, and complained of neck pain (Tr. 512), x-rays of her cervical spine were "normal" (Tr. 415), and examination of her back proved unremarkable (Tr. 511-12). Later, the range of motion of plaintiff's neck was listed as "much improved" (Tr. 412).

The record also shows that plaintiff sought regular treatment for complaints of back pain only through August 2002 (Tr. 260-65, 276). She did not seek back treatment again until November 2004, following the automobile accident (Tr. 512). Thereafter, plaintiff received treatment for her back pain on only two occasions, July 1, 2005, and August 23, 2005 (Tr. 398-99, 469-70).

The ALJ also discussed plaintiff's respiratory problems and similarly discounted these complaints because she continues to smoke despite the repeated warnings of her treating doctors (Tr. 18-19).

The record supports this finding. Plaintiff continued to smoke throughout the relevant period despite her complaints of asthma and bronchitis, and despite numerous admonitions from her

31

treating physicians to stop smoking (Tr. 272, 286, 322, 324, 380, 403, 405, 413, 418, 421, 425, 427, 451).

The Eighth Circuit has held that an ALJ may properly discount a claimant's complaint of breathing problems when that claimant continues to smoke, despite the admonitions of her treating doctors to quit. <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 (8th Cir. 2000).

Finally, the ALJ addressed plaintiff's complaints of depression by noting that there is no diagnosis of depression in her medical records and no reports of mental health treatment (Tr. 17-18); whereas, a consulting medical practitioner, who reviewed the records, determined that plaintiff has no severe mental impairment (Tr. 18).

Again, the record supports this finding. Although the medical records contain entries dealing with depression and plaintiff has been prescribed medication to treat this problem, there is nothing in the evidence to support the argument that plaintiff's depression is anything more than episodic difficulties that have been adequately addressed by medication prescribed by her family doctor. Furthermore, a consulting psychologist reviewed the plaintiff's medical records and concluded that plaintiff does not have a severe mental impairment (Tr. 383), and her ability to function is not limited by a mental impairment (Tr. 393).

32

## 4. PRECIPITATING AND AGGRAVATING FACTORS

The ALJ did not address precipitating or aggravating factors in deciding this case.

A review of the records reflects that plaintiff's back problems are alleged to be precipitated by almost any activity by plaintiff. The only question -- addressed and resolved above -- is whether these complaints are well-founded. They are not.

The records clearly show that plaintiff's breathing problems are precipitated and aggravated by her continued smoking of approximately a pack of cigarettes a day, which is solely within her power to stop. Therefore, there appears to be little more that may be said on this subject.

## 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The ALJ did not discuss medication in his opinion. However, the medical records show that, with few exceptions, plaintiff has not had many side effects from her medications, although she maintains that most have proven ineffective. For example, plaintiff testified that pain from her back problems is relieved by soaking in a whirlpool, frequently reclining, and taking non-steroidal, anti-inflammatory medication and a muscle relaxer, but that the condition itself remains disabling (Tr. 602-03). Similarly, plaintiff testified that her shortness of breath is relieved by an inhaler, a rescue inhaler, and a nebulizer machine (Tr. 604-07) but that the condition makes it impossible for her

33

to perform tasks such as climbing a half-flight of stairs (Tr. 605). The question, then, is whether plaintiff's condition is disabling to the extent that she cannot perform even sedentary work. The answer depends on whether one believes plaintiff's representations about her restrictions, which have been shown to be unreliable.

### 6. FUNCTIONAL RESTRICTIONS

According to plaintiff, she can sit comfortably for about 20 minutes, walk about 15 to 20 minutes, and lift about five pounds (Tr. 611). The ALJ discounted these restrictions based on credibility considerations and found that plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry five pounds; stand/walk or sit for six hours during an eight-hour day; occasionally stoop, crouch, crawl, kneel, climb, and balance; but should avoid extremes in temperature and humidity, and environments containing dust, fumes and gases (Tr. 20).

Residual Functional Capacity is the most an individual can do despite her limitations, 20 C.F.R. §§ 404.1545 and 416.945, and is determined based upon all the evidence in the record. Pearsall v. Massanari, 274 F.3d 1211, 1217-1218 (8th Cir. 2001). Although a medical question, the Residual Functional Capacity Assessment is not based only on "medical" evidence, but must be based on all the relevant, credible evidence in the record. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).

34

Plaintiff argues that the ALJ did not consider all of the medical records in making his RFC determination. However, the fact that an ALJ did not describe the entirety of plaintiff's medical history does not mean that he disregarded certain aspects of the record. Wheeler v. Apfel, 224 F.3d 891, 896, n.3 (8th Cir. 2000). Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. Miller v. Shalala, 8 F.3d 611, 613 (8th Cir. 1993).

A review of the ALJ's decision shows he properly considered the evidence of record in making his determination (Tr. 16-20).

Plaintiff also argues that the ALJ failed to consider the combined effects of these impairments in making his determination of plaintiff's Residual Functional Capacity. However, the Eighth Circuit Court of Appeals has said that an ALJ sufficiently considered impairments in combination when he separately discussed each impairment and the claimant's subjective complaints and daily activities. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

Here, the ALJ properly considered all of plaintiff's impairments and made his Residual Functional Capacity Assessment based on the credible evidence in the record.

### B. CREDIBILITY CONCLUSION

Although the ALJ's written decision is somewhat light on the facts and often disjointed in its analysis of the Polaski

35

factors, my review of the entire record, as outlined above, confirms that his ruling falls within the substantial-evidence standard, that is, there is adequate evidence to reasonably support his conclusion that plaintiff is not credible as to her description of her physical and mental restrictions; and therefore, based on the entire record, she is not entitled to disability insurance benefits and supplemental security income benefits based on disability.

## VI. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole (1) supports the ALJ's finding that plaintiff's subjective complaints of disability are not credible and (2) supports the ALJ's residual functional capacity assessment. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

```
    /s/
ROBERT E. LARSEN
United States Magistrate Judge
```

Kansas City, Missouri
July 17, 2008

Case 6:07-cv-03143-REL   Document 11   Filed 07/17/08   Page 36 of 36